**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

Plaintiff,

vs.

STEVE MARSHALL, in his official capacity as Attorney General of Alabama,

Defendant.

Case No. 2:26-CV-00897

**BRIEF IN SUPPORT OF**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................4

A. CCIA Members Create and Facilitate Protected Speech by Operating App Stores and Developing Mobile Apps ..........................4

1. Mobile Apps Offer Vast Amounts of Protected Speech and Information..........................................................5

2. CCIA Members' Mobile App Stores Disseminate Vast Amounts of Protected Speech..........................................7

B. Existing Protections for Child-Directed Apps, Including Parental Controls ..........................................................8

C. The Alabama App Store Accountability Act ....................................10

ARGUMENT ..........................................................................................14

I. CCIA HAS STANDING TO BRING THIS CHALLENGE ........................16

II. CCIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT AND VAGUENESS CLAIMS ........................................18

A. The Act's Verification and Consent Requirements Violate the First Amendment..........................................................18

1. The Act Implicates the Protected Speech of App Stores, Developers, and Their Users..........................................18

2. The Act Burdens These Rights by Restricting Speech at Key Chokepoints..........................................................21

a. Chokepoint 1: Age Verification and Parental Tethering at Account Creation ......................................22

b. Chokepoint 2: Parental Consent Required for Each App Download..............................................24

c. Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms ....26

3. The Act's Age Verification and Parental Consent Regime Triggers Strict Scrutiny ....27

a. The State's Purpose Is to Bar Access to Content ....28

b. The Act Restricts Access to an Entire Medium of Protected Expression ....32

4. The Age Verification and Parental Consent Requirements Are Not Narrowly Tailored and Cannot Survive Any Form of Heightened Scrutiny ....34

a. The Act's Verification and Consent Regime Is Overinclusive ....36

b. The Act Regulates Far More Than Contracts and Commercial Speech ....38

c. Existing Parental Controls and Laws Diminish the State's Interest and Further the Act's Tailoring Problem ....40

d. The Act is also Woefully Underinclusive ....42

III. THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION ....43

A. CCIA and Its Members Will Suffer Irreparable Harm if the Act Is Not Enjoined ....43

B. A Preliminary Injunction is in the Public Interest ....46

IV. THE AGE VERIFICATION, PARENTAL VERIFICATION AND PARENTAL CONSENT PROVISIONS CANNOT BE SEVERED FROM THE REST OF THE ACT ....46

CONCLUSION ....48

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....................18, 21, 40

*Anders v. Hometown Mortg. Servs.*,
346 F.3d 1024 (11th Cir. 2003)....................46

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....................19

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024)....................16

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982)....................20

*Bd. of Trs. of State of Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)....................40

*Boos v. Barry*,
485 U.S. 312 (1988)....................31

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)....................*passim*

*CCIA v. Uthmeier*,
2026 WL 3071065 (11th Cir. Oct. 14, 2026)....................*passim*

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980) (Stevens, J., concurring)....................39

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)....................21

*City of Austin v. Regan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022)....................34

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994)........................................................................*passim*

*DA Mortg., Inc. v. City of Miami Beach*,
486 F.3d 1254 (11th Cir. 2007) ....................................................14

*Ex parte Young*,
209 U.S. 123 (1908)......................................................................14

*Florida Preborn Rescue, Inc. v. City of Clearwater*,
161 F.4th 732 (11th Cir. 2025) .....................................................35

*Florida v. Dep't of H.H.S.*,
19 F.4th 1271 (11th Cir. 2021) ...............................................44, 46

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)......................................................................*passim*

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024) .....................................................43

*J.T. ex rel. Thode v. Monster Mt., LLC*,
754 F. Supp. 2d 1323 (M.D. Ala. 2010).........................................42

*Jamison v. State of Tex.*,
318 U.S. 413 (1943)......................................................................33

*King v. Campbell*,
988 So. 2d 969 (Ala. 2007)...........................................................47

*LaCroix v. Town of Fort Myers Beach*,
38 F.4th 941 (11th Cir. 2022) .......................................................35

*Lovell v. City of Griffin, Ga.*,
303 U.S. 444 (1938)......................................................................33

*Martin v. City of Struthers, Ohio*,
319 U.S. 141 (1943)......................................................................33

*McCullen v. Coakley*,
573 U.S. 464 (2014)................................................................35, 40

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983)....................28

*Moody v. NetChoice LLC*,
603 U.S. 707 (2024)....................18, 20

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................21

*Nat'l Inst. of Fam. & Life Advocs. ("NIFLA") v. Becerra*,
585 U.S. 755 (2018)....................34

*NetChoice v. Att'y Gen. of Ga.*,
2026 WL 3079563 (11th Cir. Oct. 15, 2026)....................16

*NetChoice v. Murrill*,
2025 WL 3634112 (M.D. La. Dec. 15, 2025)....................36

*NetChoice, LLC v. Fitch*,
787 F. Supp. 3d 262 (S.D. Miss. 2025)....................36

*NetChoice, LLC v. Griffin*,
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)....................37

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025)....................41

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)....................36

*Nken v. Holder*,
556 U.S. 418 (2009)....................45

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020)....................14

*Packingham v. North Carolina*,
582 U.S. 98 (2017)....................7, 8, 23, 37

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)....................31

*Reno v. ACLU*,
521 U.S. 844 (1997)....................5

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....................44

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................*passim*

*TikTok v. Garland*,
604 U.S. 56 (2025)....................35

*Turner Broad. Sys., Inc. v. F.C.C.*,
520 U.S. 180 (1997)....................39

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)....................34

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001)....................39

*Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................39, 40

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988)....................16, 17

## STATUTES

Ala. Code § 1 ....................5, 10, 11, 24, 42

Ala. Code § 2 ....................4, 11, 15

Ala. Code § 3 ....................*passim*

Ala. Code § 4 ....................12, 26, 47

Ala. Code § 5 ....................11, 15

Ala. Code § 6 ....................45

Ala. Code § 7 ....................15

Ala. Code § 8-19K-1 *et seq*. (App Store Accountability Act).........................*passim*

**RULES**

Fed. R. Civ. P. 65 ........................................................................................1

**MISCELLANEOUS**

Anna Barrett, Alabama Senate passes bill requiring app stores to verify ages of users, Alabama Reflector (Feb. 6, 2026)................................30

Tr. of Ala. H.R. Floor Debate on H.B. 161 (Jan. 14, 2026) ...................................31

Tr. of Ala. H.R. Floor Debate on H.B. 161 (Jan. 22, 2026) ...................................28

Tr. of Ala. S. Floor Debate on H.B. 161 (Feb. 5, 2026) ........................................29

Tr. of Hr'g Before the Ala. S. Child. & Youth Health Comm. (Jan. 28, 2026) ..........................................................................................29

Plaintiff Computer & Communications Industry Association ("CCIA") has moved for a preliminary injunction under Federal Rule of Civil Procedure 65 and offers the following brief in support.

## INTRODUCTION

This case is about Alabama's attempt to age-gate an entire ecosystem of speech. No state has ever required its citizens to prove their age before entering a bookstore, reading a newspaper, or opening a Bible. But Alabama's App Store Accountability Act (the "Act") does exactly that—for every mobile app on every mobile phone. Under the Act, before an Alabamian may access an app store and then download apps that offer everything from news, political commentary, educational materials, e-books, music, and movies, to Bible study, meditation guides, and community message boards, they must first verify their age with the app store. If they are under 18, they must link their account to a verified parent's account and obtain express parental consent for *each and every* app download and *each and every* in-app purchase, full stop.

No brick-and-mortar analog to the Act would ever survive constitutional muster—and the basic principles of freedom of speech "do not vary when a new and different medium for communication appears." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (citation omitted). Imagine a state law that required every

bookstore, movie theater, video rental store, record shop, symphony hall, arcade, and newsstand to verify the age of every patron at the door and then required parental consent before those under 18 could enter. Once inside, the parent would have to separately provide consent for every book, movie, newspaper, greeting card, or board game the minor wished to buy, be it a book by Ernest Hemingway or J.K. Rowling, a Taylor Swift album, or a subscription to *Sports Illustrated Kids*. That law would be burdensome, frustrating, and clearly unconstitutional.

The Act violates the First Amendment several times over. To begin, the Act's threshold age verification and parental consent requirements burden app stores' protected rights to make available and disseminate a wealth of protected speech generated by app developers and users of apps. These mechanisms similarly burden the First Amendment rights of app developers to distribute their speech, as well as the rights of both adults and minors to access and create protected speech as users of the regulated app stores and apps. On top of these threshold verification and consent burdens, the Act's ongoing parental consent requirements for every app download and in-app purchase pose an additional layer of unconstitutional friction on app stores, developers, and users' abilities to access and distribute protected speech.

Strict scrutiny applies for two independently sufficient reasons. First, it applies because the legislative record—including statements from both sponsors in

the House and Senate, as well as other representatives and senators—makes clear that the Act is justified by the desire to protect minors from content the state deems harmful or age-inappropriate. This speech-suppressive purpose triggers the highest form of First Amendment scrutiny. *Free Speech Coal., Inc. v. Paxton* ("*FSC*"), 606 U.S. 461, 482 (2025); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). Separately, strict scrutiny applies to the Act because its threshold age-verification and parental-consent requirements restrict "an entire medium of expression," which is presumptively impermissible. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994).

In any event, the Act's threshold age-verification and parental-consent requirements cannot withstand any form of heightened scrutiny. While such sweeping laws may avoid expressly targeting certain content, "the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech." *Id.* The Act poses precisely that problem by indiscriminately barring access to all manner of content, from ebooks to audiobooks to videos and so forth. This is a statute of startling overbreadth, which is wildly disproportionate to any interest the State seeks to serve.

CCIA, a trade association representing operators of leading mobile app stores and app developers, seeks a preliminary injunction barring the State from enforcing this unconstitutional regime as applied to its members. The Act's threshold age-

verification and parental tethering and consent provisions impermissibly bar each of CCIA's member app stores from allowing anyone access to all manner of protected speech absent the law's elaborate preclearance regime. §§ 2-3. And without that mandate, the Act's ongoing requirements for parental consent for all app downloads and in-app purchases (§§ 3(2), 9(4)(a))—which depend on the threshold age-verification—cannot function. Those provisions are also independently unconstitutional and should be enjoined at least as to CCIA's app developer members who speak and facilitate speech.

## BACKGROUND

### A. CCIA Members Create and Facilitate Protected Speech by Operating App Stores and Developing Mobile Apps

CCIA is a membership-based trade organization whose members operate some of the world's popular mobile app publishing services (which the Act calls "app stores"). Decl. of M. Schruers in Supp. of Pl.'s Mot. for Prelim. Inj. ("Schruers Decl.") ¶¶ 3, 5-6, 28. An app store is a digital publishing service where software developers can upload apps, and users can discover and download those apps onto their devices. Decl. of M. Bye in Supp. of Pl.'s Mot. for Prelim. Inj. ("Bye Decl.") ¶ 5. The app stores operated by CCIA members that are regulated by the Act are: (1) Google Play; (2) the Apple App Store; and (3) the Amazon Appstore. Schruers Decl. ¶¶ 5-27; Bye Decl. ¶ 2.

CCIA's members are also leading app developers, who create and offer popular mobile apps for download in app stores. Schruers Decl. ¶ 5. Those member-created apps include email apps like Gmail, video-viewing and sharing apps like YouTube, e-book or audiobook apps like Kindle and Audible, and apps that allow users to communicate and obtain information on a wide variety of topics (e.g., IMDb, Goodreads). *Id.* ¶¶ 4, 14, 21. The Act's regulatory scope encompasses both CCIA's member app stores, § 1(6)-(7),[1] and CCIA's member app developers, §§ 1(5), 9, and directly burdens the First Amendment rights of CCIA members in both capacities. Schruers Decl. ¶¶ 5-28, 44-56.

1. <u>Mobile Apps Offer Vast Amounts of Protected Speech and Information</u>

Apps are to smartphones what websites are to computers: mediums for speech "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (citation omitted). The variety of mobile apps is vast, and apps allow users to access, create, and exchange an enormous quantity of speech, including every form of protected expression: news and political material, religious material, educational content, social media, personal writing, books, magazines, movies, television, short-form video, music, art, games, scientific material, informational services like maps,

[1] All statutory citations, unless otherwise noted, are to Alabama Code § 8-19K-1.

encyclopedias, and dictionaries, and much more.[2] Schruers Decl. ¶¶ 29-31; Bye Decl. ¶ 9. In certain instances, of course, mobile users can access the same content on a website accessed through a browser. But apps are designed specifically to optimize the user experience on mobile devices, thereby allowing users to communicate, receive, and transmit protected expression as they go about their daily lives, rather than only when they are in front of a computer. *See* Strauser Decl. ¶ 18.

App stores teem with protected speech. Their most downloaded apps offer access to vast amounts of speech, as well as tools for users to create, engage in, and find speech. Indeed, approximately 47% of apps downloaded in the Apple App Store and Google Play in 2025 were categorized as "Games", "Entertainment", and "Communication" apps.[3] And in the past two years, the most downloaded free apps in Apple's App Store,[4] Google's Play Store,[5] and Amazon's Appstore[6] included: **Threads** (online community where users "come together to discuss everything from

---

[2] While the list is endless, a snapshot of mobile apps touching on all categories includes NYTimes, Fox News, Bible Chat, Gabb Messenger, Duolingo, Khan Academy, PubMed, Substack, Kindle, Vogue, Netflix, Prime Video, YouTube, Spotify, Poesie, Roblox, VSCO, and Etsy.

[3] Nathalie Azzi, *App Downloads by Category in 2025*, AppTweak (Dec. 15, 2025), https://www.apptweak.com/en/reports/app-downloads-by-category (last visited Oct. 15, 2026).

[4] *See Top Free Apps Chart*, Apple, https://apps.apple.com/us/iphone/story/id1847717004 (last visited Oct. 15, 2026).

[5] *Apps*, Google Play, https://play.google.com/store/apps?device=phone&hl=en_US (last visited Oct. 15, 2026).

[6] *Amazon Best Sellers*, Amazon.com, https://www.amazon.com/gp/bestsellers/mobile-apps/ref=zg_bs?ie=UTF8&tf=1 (last visited Oct. 15, 2026).

the topics you care about today to what's trending tomorrow"); **TikTok, Instagram, and YouTube** (online services that constitute the "modern public square" because of the speech they facilitate, *see Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)); **CapCut** ("easy-to-use video editing" and animation capabilities); **WhatsApp** (allows users to make calls, message privately, and share files with "friends and family"); **Google** (provides access to Google's search engine to search and access the world's information); and the video streaming services **Tubi**, **Peacock**, and **Pluto TV**. *See also* Bye Decl. ¶¶ 13-16. In addition to these large apps, small app developers also publish a wide array of educational, skill-building, and cultural apps and make up the majority of apps available in many app stores. *See id.* ¶ 16; Compl. ¶ 29, ECF No. 1 (noting that 90% of all developers in Apple's App Store are "small developers").

2. <u>CCIA Members' Mobile App Stores Disseminate Vast Amounts of Protected Speech</u>

Apps facilitate vast amounts of speech and expression, and app stores serve a critical role in that speech process. They are curated publishing services where users securely find, review, and download the mobile apps that best suit their interests. *See* Bye Decl. ¶¶ 7, 11-13. App stores also provide a gateway for millions of app developers to disseminate content to reach their users. *Id.* ¶¶ 14-18. In this way, app stores offer a "relatively unlimited, low-cost capacity for communication of all

kinds . . . to users engaged in a wide array of protected First Amendment activity on any number of diverse topics." *Packingham*, 582 U.S. at 98 (cleaned up).

CCIA members operate popular mobile app stores. Google operates Play: "a global digital distribution platform that . . . facilitates access for billions of users worldwide—and millions of users in America—to discover millions of high-quality apps, games, books, movies, and other digital content configured for the Android ecosystem." Bye Decl. ¶ 5. Apple operates the App Store: "a safe and trusted place to discover and download … [n]early 2 [million] apps" and "[e]xplore in-app events like movie premieres, gaming competitions, and livestreams."[7] And Amazon operates the Amazon Appstore: "an app store for Amazon Fire Tablets . . . [where] customers can discover, download, and save on new apps and games."[8]

### B. Existing Protections for Child-Directed Apps, Including Parental Controls

CCIA members' app stores provide parents with many ways to control their children's online experiences. Apple, Google, and Amazon all require child-directed apps (primarily directed at users under 13) to contain only content appropriate for their rated age category, and they reject apps and content that contain, e.g., "sexually

[7] *Apple App Store*, Apple, https://www.apple.com/app-store/ (last visited Oct. 15, 2026).
[8] *Amazon Appstore*, Amazon.com, https://www.amazon.com/b?ie=UTF8&node=77179530011 (last visited Oct. 15, 2026).

explicit" content, profanity, or content that would not be considered "family friendly," among other triggers. Schruers Decl. ¶¶ 35-37. These app stores also impose additional protections over children's data and implement parental gates in order to link out of the app, request permissions, or make in-app purchases. *Id.* ¶ 37.

App stores also enable parents to control their children's exposure to apps and content. *See* Schruers Decl. ¶ 38. Google, Apple, and Amazon all provide parental controls that allow parents to lock their children's screens for bedtime, block unwanted apps, filter accessible content by age category, and set up an approval process for purchases and downloads, among other tools. *Id.*; Bye Decl. ¶ 29. All CCIA member app stores also assign age ratings to apps based on the age-appropriateness of the app's content. *See* Schruers Decl. ¶ 35; Bye Decl. ¶ 31.

Of course, parents can also exercise control at the device- and network-levels. They can control what devices their children have, and when; they can control the networks minors use to connect to the Internet; and they can manage, via internet service providers, which websites their children can use and when. This array of parental controls allows parents to choose the level of parental oversight based on their child's specific needs, as well as their own.

These parental controls are comprehensive, effective, and widely used. Indeed, Google *requires* that parents of children under the age of 13 use its parental

controls infrastructure ("Family Link") to create and monitor their child's Google Account. Bye Decl. ¶ 29. And in addition to these comprehensive parental controls offered by app stores, many apps themselves independently offer robust parental controls—including content filters, screen time limits, and supervised accounts. *See* Schruers Decl. ¶ 39; Strauser Decl. ¶¶ 8-10.

### C. The Alabama App Store Accountability Act

Despite these extensive controls and protections that empower parents to make the best choices for their families, Alabama imposes a broad new set of legal mandates that removes and second-guesses parental choice. The Act puts distinct but related obligations on (1) "[a]pp [s]tores," defined as "publicly available . . . software application[s] . . . that allow[] account holders to download apps from third-party developers onto a mobile device, § 1(6); and (2) "developer[s]" defined as "[a]n entity that owns or controls an app made available through an app store or a pre-installed app," § 1(9). These mandates will profoundly affect the mobile app environment and limit its robust exchange of speech and information.

***Age Verification and Parental Consent Requirements.*** Under the guise of shielding kids from harmful content, the Act requires all mobile app stores to gatekeep the millions of apps they publish by implementing an onerous state-

mandated system of age verification for all users, and parental verification and ongoing consent for minor accounts.

*Age verification*. Before any person, of any age, can create an account to access an app store, the app store must "[r]equest age category information from the individual" and "[v]erify the individual's age category" using either "[c]ommercially available methods reasonably designed to ensure accuracy," or through some other method "that complies with rules adopted pursuant to [the Act]." § 2(a)-(b). After sorting account holders into one of four state-mandated "age category" buckets (§ 1(2)), app stores must then provide developers with "real-time access" to "[a]ge category data for each user located in [Alabama]," as well as "[t]he status of verifiable parental consent for every minor located in this state." § 5.

*Parental identity verification and account tethering*. If a user is found to be under 18, app stores must continue to bar access until the minor's account is "affiliated with a parent account." § 3(1). To do this, the app store must somehow verify that the linked account belongs to a "biological parent", a "legal guardian", or an "individual with legal custody" over the minor. §§ 1(15)-(16), 3(1). The app store must also verify the parent's age to ensure that they are over the age of 18. § 1(16).

*Parental consent for app downloads, in-app purchases, and significant changes*. For accounts belonging to minors, the Act demands parental consent in

order to create an app store account (or continue to use one, in the case of pre-existing apps), and then again *every single time* the minor wants to download *any* app or make *any* in-app purchase. § 3(1)-(2). Moreover, the app store must obtain renewed parental consent whenever the app developer makes a "significant" change to the app's terms of service or privacy policy. § 4.

*Mandatory data requests, sharing, and app developer re-verification*. The Act also requires app developers to "[r]equest age category data or verifiable parental consent" every time a user downloads an app, purchases an app, launches a pre-installed app for the first time, or makes a significant change to the app. § 9(a)(4). Developers must then "verify" (1) the age category assigned to app users, and (2) for minor users, whether parental consent has been obtained. § 9(1). These provisions necessitate the sharing of users' personal data with a wide range of app developers with varying levels of digital security and sophistication, Bye Decl. ¶ 44, and essentially demand that app developers build a mechanism to integrate with app stores and verify that consents have been obtained. Strauser Decl. ¶¶ 11-12, 17.

***Statutory violations and enforcement.*** Violations of the Act are deemed unfair or deceptive trade practices and enforceable by the Attorney General, who may seek penalties of up to $7,500 per violation and punitive damages where the entity exhibits a "consistent pattern of knowing or reckless conduct." § 11(a)-(b).

To contextualize the combined effect of these requirements, consider their effect on Audible, a CCIA member app that allows listeners to access millions of audiobooks, podcasts, and original adaptations of literature via in-app download or purchase. Strauser Decl. ¶ 3. Starting on January 1, 2027, anyone in Alabama who wishes to obtain the Audible app to access such material will have to first prove their age to the app store. For any user who does not want to verify their age due to privacy concerns, or who cannot verify their age because they lack the required documentation, Alabama will bar them from accessing the app store in its entirety, and that user will be unable to download Audible or any other app. For those users who do verify their age, app stores cannot allow anyone under 18 to download Audible (or any other mobile app) unless their account is first linked to the account of a verified parent or legal guardian and the parent has expressly consented to that specific app download. And even after clearing an initial age-verification process, an account link process (which includes more age verification), and obtaining parental consent to download the app itself, the minor *still* cannot purchase an audiobook or any other content within the Audible app without an additional round of parental consent. On top of that, whenever Audible makes a "significant change" to its terms of service—possibly triggered by the mere addition of a new audiobook

or advertisement, or design update to the platform—the minor's access to the app will pause, and the parent will need to redo the consent they already provided.

## ARGUMENT

CCIA and its members are entitled to a preliminary injunction against the Attorney General, as he is charged with enforcing the Act. *See Ex parte Young*, 209 U.S. 123 (1908).

A preliminary injunction is warranted, as (1) CCIA and its members have a "substantial likelihood of success on the merits"; (2) they will suffer "irreparable injury . . . unless the injunction issues"; (3) the "threatened injury to [CCIA's members] outweighs whatever damage the proposed injunction may cause the opposing party"; and (4) the injunction is not "adverse to the public interest." *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020). All factors weigh in favor of a preliminary injunction here.

CCIA seeks as-applied relief, which is appropriate "[w]here plaintiffs challenge the validity of [the] statute because they seek to vindicate their own rights." *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007). The Act's age verification, parental verification, and parental consent requirements are unconstitutional as applied to all CCIA mobile app store members (Google Play, Amazon Appstore, and Apple App Store) and to CCIA member

developers of apps that host, facilitate, or engage in protected expression, including Kindle, Audible, IMDb, Twitch, Amazon Music, YouTube, Gmail, Google Meet, and Google Docs. §§ 2-3, 5, 7, 9, 11. *See* Schruers Decl. ¶ 5. As applied to each of these members, the Act impermissibly burdens their ability to host, facilitate, or engage in constitutionally protected speech.

First and foremost, CCIA seeks to protect its app store members from the Act's threshold age-verification and parental consent mandate that bars each app store from allowing anyone to enter unless they verify their age and, if a minor, tether their account to a verified parent's. §§ 2-3. This across-the-board mandate (by design) does not necessitate app-by-app inquiry because it applies at the app store account level to restrict access to an entire medium of speech. As discussed in Section IV, *infra*, an injunction barring enforcement of these threshold provisions means that the remainder of the Act—including the parental-consent requirements for each app download and in-app purchase—cannot function against CCIA's members.

While the Court need not go further, other provisions of the Act independently violate the First Amendment. In particular, it is unconstitutional to require CCIA member app stores and app developers to obtain parental consent for every single app download and in-app purchase—blunderbuss restrictions that burden access to

apps that host, facilitate, or engage in all manner of protected speech. §§ 3(2)-(3), 9(4)(a). At minimum, the Court should enjoin those parental consent requirements for app downloads and in-app purchases for CCIA member apps that host, facilitate, or engage in speech, including Kindle, Audible, IMDb, Twitch, Amazon Music, YouTube, Gmail, Google Meet, and Google Docs.

## I. CCIA HAS STANDING TO BRING THIS CHALLENGE

CCIA has associational standing to assert these claims because (1) at least one of its members has standing to sue, (2) the interests the lawsuit seeks to protect are germane to CCIA's purpose, and (3) the claim can be resolved and the requested relief granted without the participation of individual members. *Baughcum v. Jackson*, 92 F.4th 1024, 1031, 1037 (11th Cir. 2024); *CCIA v. Uthmeier*, 2026 WL 3071065, at *4-5 (11th Cir. Oct. 14, 2026) (finding CCIA had associational standing to assert First Amendment challenge on behalf of its members); *NetChoice v. Att'y Gen. of Ga.*, 2026 WL 3079563, at *3-4 (11th Cir. Oct. 15, 2026) (same, with respect to similar trade association challenging a similar law). Schruers Decl. ¶¶ 3, 5, 57.

*First*, CCIA has standing to challenge the Act because it is "aimed directly at" CCIA's app store and developer members, "who . . . w[ould] have to take significant and costly compliance measures" to implement the Act's onerous requirements across their technologies. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392

(1988)); Schruers Decl. ¶¶ 44-47; Bye Decl. ¶¶ 36-45; Strauser Decl. ¶¶ 12, 17-18. They also engage in conduct that is "affected with a constitutional interest … that is proscribed by" the Act. *Uthmeier*, 2026 WL 3071065, at *4; Schruers Decl. ¶¶ 50-57.

*Second*, this lawsuit is brought to vindicate interests "germane to" CCIA's purpose of "promot[ing] open markets, open systems, and open networks, and advocat[ing] for the interests of the world's leading providers of technology products and services[.]" Schruers Decl. ¶¶ 3, 57; *Uthmeier*, 2026 WL 3071065, at *5.

*Third*, CCIA members' individual participation is unnecessary because "CCIA's free-speech claim, which it brings on behalf of its member platforms, turns on whether [the Act] implicates the First Amendment, whether it is content based or content neutral, and whether it is appropriately tailored to the asserted state interest—inquiries that don't depend on fact-intensive determinations regarding the member platforms." *Uthmeier*, 2026 WL 3071065, at *6. "Nor does CCIA's requested remedy require the individual members' participation—for the simple reason that it seeks declaratory and injunctive relief, rather than damages." *Id.*

## II. CCIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT AND VAGUENESS CLAIMS

### A. The Act's Verification and Consent Requirements Violate the First Amendment

1. The Act Implicates the Protected Speech of App Stores, Developers, and Their Users

"All manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections; no less can hold true when it comes to speech . . . conveyed over the Internet." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (cleaned up). This list is by no means exhaustive: the Court has also recognized that video games and social media constitute protected speech. *Brown*, 564 U.S. at 786, 790; *Moody v. NetChoice LLC*, 603 U.S. 707, 728 (2024). Likewise with apps that provide access to information, such as maps (Google and Apple Maps), encyclopedias (Wikipedia), online dictionaries and thesauruses (Merriam-Webster), astronomy charts (Stellarium), and other reference materials (FactMonster, the Animal Encyclopedia). *See Sorrell*, 564 U.S. at 570 ("Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs."). And "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary'

when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (citation omitted).

The mobile apps developed by CCIA's members embody protected expression in their own right and are conduits for an immense volume of protected speech created by others, including all manner of books, magazines, and other writings, news and other journalism, political speech, film and video content, music and audio content (such as podcasts), religious material, instructional and other informational content, tools that facilitate communications (such as email, direct messaging, and texting services), and much more. *See supra* Background § A.1-2. Users of mobile apps and app stores are also protected by the First Amendment when they produce their own speech on apps (e.g., publishing an audiobook on Audible or a video on YouTube) and when they access any of the constitutionally protected speech discussed above. *Free Speech Coal.*, 606 U.S. at 482-83; *Brown*, 564 U.S. at 799.xz

App stores themselves have First Amendment rights as gateways through which this vast range of expression is published and disseminated. The Supreme Court has long recognized that both "the creation and dissemination of information are speech." *Sorrell*, 564 U.S. at 570; *accord Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("If the acts of disclosing and publishing information do not constitute

speech, it is hard to imagine what does fall within that category[.]") (cleaned up); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality op.) ("The right of freedom of speech and press . . . embraces the right to distribute literature"). Under the First Amendment, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1.

In addition to disseminating speech, app stores engage in the additional "expressive activity" of "[d]eciding on the third-party speech that will be included in or excluded from a compilation," i.e., their app stores, and then "organizing and presenting the included items[.]" *Moody*, 603 U.S. at 731-32; Bye Decl. ¶¶ 7-13; Schruers Decl. ¶¶ 36-37. Those editorial rights are compromised when "subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568 (citation omitted).

These protections equally apply to the dissemination of speech that minors have a right to access. "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown*, 564 U.S. at 794 (cleaned up). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable

for them." *Id.* at 795. The burden on minors' rights to access this speech is additionally imposed on parents, who must verify their relationship to their minor children and then individually approve every single app and in-app purchase to facilitate access to that speech. And the law burdens adults' rights to access speech by requiring them to verify their age at the threshold of app stores. *See Free Speech Coal.*, 606 U.S. at 483.

Furthermore, the fact that certain apps and certain material within apps are sold (as opposed to given away for free) does nothing to limit the First Amendment's application in this context. *See id.* (striking down law limiting the sale or rental of video games); *303 Creative*, 600 U.S. at 594 ("Many of the world's great works of literature and art were created with an expectation of compensation."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is [] immaterial").

2. <u>The Act Burdens These Rights by Restricting Speech at Key Chokepoints</u>

"Laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010). The Act's central mechanism is an interlocking series of verification and consent requirements that inhibit the free flow of speech at key chokepoints: **(1) account creation** [via age verification, parental tethering]; **(2) prior to**

**downloading each app** [parental consent]; and **(3) continually, with every in-app purchase and significant change to an app's terms of service** [parental consent]. Failure at any one of these steps will cut off users from accessing speech and app developers and app stores from being able to disseminate their own speech and third-party speech to the public.

a. *Chokepoint 1: Age Verification and Parental Tethering at Account Creation*

Because app stores are the initial gateway to accessing any app and any speech therein, an access burden at the account-creation level operates as a barrier at the threshold of speech disseminated via mobile apps. *See* Bye Decl. ¶¶ 9, 44-46; Schruers Decl. ¶¶ 28-29, 54. These threshold age verification, parental identity verification, and parental consent requirements lie at the very heart of the Act and burden all manner of constitutionally protected speech across the entire medium of mobile apps. *See City of Ladue*, 512 U.S. at 48 ("regulation of a medium inevitably affects communication itself").

***Step 1: Age Verification.*** The Act prohibits anyone—be they 12, 35, or 60—from accessing any app without first clearing an invasive age verification hurdle. The Supreme Court has confirmed that submitting to age verification is a burden on "the right to access speech." *Free Speech Coal.*, 606 U.S. at 482-83. That's especially true here where, in contrast to the law at issue in *Free Speech Coalition*,

the speech at issue is protected as to both adults and minors, who equally have a First Amendment right to access it.

The Act's age verification requirement will entirely bar the following users from receiving and producing speech on every single mobile app: users who (1) cannot adequately verify their age because they lack the type of age verification necessary, such as an ID or credit card, (2) do not want to submit to age verification due to concerns about privacy; and (3) are minors who lack adequate documentation—whatever that may be—or parental involvement to link a parent's account. *See* Bye Decl. ¶¶ 38-39, 42-43; Schruers Decl. ¶¶ 45-47. These restrictions significantly burden the First Amendment rights of app users to receive and engage with speech, as well as the First Amendment rights of app stores to disseminate speech. *See Packingham*, 582 U.S. at 108 ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."); *City of Ladue*, 512 U.S. at 54 ("Ladue has almost completely foreclosed a venerable means of communication that is both unique and important.") And, regarding the remainder of account holders who will be burdened but not wholly barred by the age verification requirement, "[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 552, 566.

***Step 2: Parental Tethering and Verification.*** If, at the age verification step, a user cannot sufficiently prove that they are over 18, the Act forces the user to link their account to that of a parent or guardian. § 3(1). The parent or guardian must then undergo an even more arduous verification process to prove that they (1) are a biological parent or have legal authority over the subject minor, and (2) are over 18 years old. §§ 1(15)-(16), 1(20)(a).

It is not clear how app stores are supposed to verify that an "adult" seeking affiliation with a minor's account is a parent or legal guardian. *See* Bye Decl. ¶ 39. But those who cannot meet this burden are prohibited from using app stores to obtain access to speech. And it is easy to conceive of the types of people who will face extreme difficulties meeting these verification burdens. Parents often have different last names than their minor children and may have a different address; most minors do not have government IDs; and minors in foster care or nontraditional family situations may not have a legal guardian who is able or willing to be linked to the minor's account. *See* Schruers Decl. ¶ 47; Bye Decl. ¶ 39. These minors will be restricted from speaking via apps and accessing app-based speech. Bye Decl. ¶ 39.

*b. Chokepoint 2: Parental Consent Required for Each App Download*

The initial verification requirements serve as the foundation for the Act's recurring parental consent mandates, but they are merely the first hurdle. By

triggering a new check each time a minor attempts to download an app, this second chokepoint burdens minors, families, and app stores and developers who wish to communicate speech that minors have every right to access. The Supreme Court has expressly rejected the argument that "the state has the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. But under the Act, parents must approve a 17-year-old's download of the Audible app (which provides access to countless audiobooks and podcasts), or apps facilitating Bible study or providing political news. *See* Strauser Decl. ¶¶ 13-16. That alone creates a substantial—and in many instances complete—obstacle to the exchange of protected speech between app developers and minor users. *See* Schruers Decl. ¶¶ 46-50, 54.

Even where parents may have no objection to the apps their children wish to download or purchase, the parental consent hurdle seriously impedes access to speech. The process is logistically cumbersome, especially because the law appears to require parents to separately authorize the download of every individual app and in-app purchase. § 3(2). This imposes considerable friction on minors and parents in everyday life. Consider the 17-year-old trying to download an app to complete a homework assignment when their parent is at work, traveling, or otherwise not monitoring their device to provide consent. *See also* Bye Decl. ¶ 42 (discussing

anticipated negative impact on user experiences and ability to access speech). Or the parent who is so fatigued by the incessant consent requests that they stop paying attention to the disclosures altogether and simply approve the requests.

#### *c. Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms*

A minor that clears the two chokepoints above faces yet additional hurdles to accessing protected speech in the apps their parents have *already approved*. The Act requires app stores to obtain ongoing parental consent for any in-app purchases. § 3(2)(iii). Additionally, whenever an app developer makes a "significant change" to its app or to its terms of service or privacy policy, the app store must again effectively restrict the minor's access to the app—and all the speech it contains—until the app store obtains "renewed verifiable parental consent." § 4(2)(b).

The parental consent requirements at this chokepoint further arrest the natural flow of speech facilitated by app stores. The requirement to obtain consent for each in-app purchase imposes a particularly outsized burden on CCIA's app developer members whose models of speech dissemination include revenue from in-app purchases, such as Audible, Kindle, Prime Video, and many others. *See* Strauser Decl. ¶¶ 4, 15, 17. This erects barriers to the dissemination of nearly every kind of speech, including books, movies, music, video games, and magazine subscriptions.

3. <u>The Act's Age Verification and Parental Consent Regime Triggers Strict Scrutiny</u>

"A law implicates the First Amendment—and thus triggers constitutional scrutiny of *some* sort—if it either (1) 'directly regulate[s] protected expressive activity' or (2) regulates even non-expressive conduct in a way that 'imposes a disproportionate burden upon those engaged in protected First Amendment activities." *Uthmeier*, 2026 WL 3071065, at *9. Courts have had "little trouble" concluding that laws that burden the ability of speech-hosting platforms to "communicate with their users" trigger constitutional scrutiny. *Id.*; *see NetChoice v. Yost*, 180 F.4th 268, 286-87 (6th Cir. 2026).

Here, at a minimum, the Act must satisfy intermediate scrutiny because it subjects all speech—protected and unprotected—to its onerous age verification and parental consent regime. *Free Speech Coal.*, 606 U.S. at 495; *see also Uthmeier*, 2026 WL 3071065, at *9. But strict scrutiny is the appropriate standard because the Act is both content-based in its justification and it burdens access to an entire medium of expression (mobile apps). Ultimately, whether the Act is subject to strict or instead to intermediate scrutiny makes no difference because the Act fails any level of heightened First Amendment review.

*a. The State's Purpose Is to Bar Access to Content*

The Act first triggers strict scrutiny because it is "content based . . . in its justification." *Uthmeier*, 2026 WL 3071065, at *9. A law that "on its face appear[s] neutral as to content and speaker" will nevertheless be deemed "unconstitutional" if "its purpose [is] to suppress speech." *Sorrell*, 564 U.S. at 566; *see also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 580 (1983) (asking whether there was "impermissible or censorial motive on the part of the legislature"). A law will only be deemed to have a content-neutral justification "if it neither references the content of speech . . . nor reflects disagreement with the message such speech conveys." *Uthmeier*, 2026 WL 3071065, at *10 (citation omitted). The Alabama legislature did both.

The legislative record repeatedly references the content of speech within mobile apps and alludes to disagreement with the messages that speech conveys, animated by the desire to protect minors from exposure to allegedly harmful content. Representative Chris Sells, who sponsored the bill and introduced it in the House, opened his remarks by noting that "[a]pp store[s are] a gateway to what our children are exposed to online." Bailey Decl. Ex. E-2 (Tr. of Ala. H.R. Floor Debate on H.B. 161 (Jan. 22, 2026)), at 2:8–10. Later, after the bill passed the House, he commented: "Whether it be issues related to cyberbullying, exploitation or access to inappropriate

content, online safety has become a top concern for parents across the state of Alabama. . . . The disturbing reality is that there are people out there who wish to do our children harm, and many of them are utilizing content available in app stores to do so."[9]

Senator Chambliss, his co-sponsor who introduced the bill in the Senate, expressed similar sentiments. "We want to all protect our children . . . until they're at an age that they can handle certain things." Bailey Decl. Ex. E-4 (Tr. of Ala. S. Floor Debate on H.B. 161 (Feb. 5, 2026)), at 3:22–4:1. Senator Chambliss analogized the bill to similar guardrails that have existed to "shield[]" children from certain physical information "until they mature enough to handle that," explaining that the bill puts those same guardrails in the digital world. *Id.* 4:2-8; *see also* Bailey Decl. Ex. E-3 (Tr. of Hr'g Before the Ala. S. Child. & Youth Health Comm. (Jan. 28, 2026)), at 24:4–16 ("right now, and for generations previous to now, if you walked into a convenience store and there was sensitive material there, there was a cover that was put over that so that accidental exposure would not occur. That's [the] norm in our society. . . . So what we are trying to do with this app store bill is the same thing that we do in a physical store[.]"). Following the bill's passage, Senator

[9] *Alabama House Passes App Store Accountability Act*, Alabama Political Reporter (Jan. 23, 2026), https://www.alreporter.com/2026/01/23/alabama-house-passes-app-store-accountability-act/ (last visited Oct. 16, 2026).

Chambliss reportedly stated that "the legislation was necessary to protect children from inappropriate material on the internet."[10] He added: "There are, unfortunately, things out there that children are not ready to see, their minds have not matured enough to see."[11]

The bill's sponsors are not alone in viewing the Act as a means to shield minors from harmful content. House Speaker Nathaniel Ledbetter commented: "Smartphones, tablets and other electronic devices have become a major part of our children's lives, and if used properly, they can be excellent educational tools. At the same time, there is a great deal of content available on these devices that kids simply have no business ever seeing."[12] Supporting the bill, Senator April Weaver similarly expressed concern about "all the exposure . . . to social media right now," stating that she was "horrified that our children are exposed to such things as this at such a young age." Bailey Decl. Ex. E-4, at 7:16-25. And Representative Russell Bedsole, who declared his support, urged that "[t]he amount of exposure that [his teenage children] have to content that frankly isn't—shouldn't be seen—. . . if it's suggestive in nature and sexual, those are things I don't want my children seeing. So I think that

---

[10] Anna Barrett, Alabama Senate passes bill requiring app stores to verify ages of users, Alabama Reflector (Feb. 6, 2026), https://alabamareflector.com/2026/02/06/alabama-senate-passes-bill-requiring-app-stores-to-verify-ages-of-users/ (last visited Oct. 16, 2026).
[11] *Id.*
[12] *Alabama House Passes App Store Accountability Act supra* n.9.

your bill takes a great step in the right direction . . ." Bailey Decl. Ex. E-1 (Tr. of Ala. H.R. Floor Debate on H.B. 161 (Jan. 14, 2026)), at 21:1–13.

Especially notable about these remarks is their preoccupation with harmful characteristics within the "substance" or messages within apps, rather than a concern about the "form" in which the substance is conveyed (i.e., some perceived harm related to mobile apps). *Uthmeier*, 2026 WL 3071065, at *12 (discussing this distinction as a means to determine whether a law was content-based or content-neutral). In contrast to *Uthmeier*, where the Eleventh Circuit recently found a social-media law's justification to be content-neutral because "[t]here's no indication" that the State disagreed with social-media companies' decisions related to content, *id.* at *11, Alabama's legislative record is replete with evidence of the State's desire to shield minors from content it perceived harmful. Because the Act quite literally "cannot be justified without reference to the content of the regulated speech," it is subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (cleaned up); *see also Paxton*, 814 F. Supp. 3d at 799 ("SB 2420 specifically sought to shield minors from certain speech the State deems objectionable or harmful . . . which is a content-based justification and would still warrant strict scrutiny.") (citing *Boos v. Barry*, 485 U.S. 312, 321 (1988)).

*b. The Act Restricts Access to an Entire Medium of Protected Expression*

Notwithstanding the State's clear concerns with certain forms of content, the legislature seems to have avoided scoping the Act to target specific content in an attempt to avoid strict scrutiny. But a State cannot circumvent the First Amendment by burdening *more* speech. In *City of Ladue*, the Supreme Court invalidated a city's ostensibly content-neutral law because it "foreclosed" an entire "means of communication that is both unique and important." 512 U.S. at 54. In affirming the unconstitutionality of the ordinance, the Court recognized half a century of precedent invalidating laws that block access to entire channels of communication, as distinct from laws that "merely shift the time, place, or manner of its use[.]" *Id.* at 55-56 (collecting cases). The Court explained that each of these "prior decisions have voiced particular concern with laws that foreclose an entire medium of expression." *Id.* at 55. "Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination," the Court emphasized, "the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech." *Id.*

That is precisely the problem with Alabama's law. Even if the law "may be completely free of content or viewpoint discrimination," its sweep is so broad that it poses a grave "danger … to the freedom of speech." *Id. City of Ladue*—and the long

line of precedent on which it rests—teaches that such laws are subject to the most stringent First Amendment scrutiny. *See also, e.g., Jamison v. State of Tex.*, 318 U.S. 413, 415 (1943) (invalidating prohibition on distribution of handbills, rejecting argument that the state "has the power absolutely to prohibit the use of the streets for the communication of ideas"); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 147 (1943) (invalidating blanket prohibition against door-to-door distributors of information as a "naked restriction of the dissemination of ideas"); *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 450 (1938) (invalidating ordinance that "in its broad sweep prohibits the distribution of 'circulars, handbooks, advertising, or literature of any kind,'' and by doing so "strikes at the very foundation of the freedom of the press by subjecting it to license and censorship").

The Supreme Court's decision in *Free Speech Coalition* underscores this principle in the specific context of age-verification laws, which restrict access to certain kinds of speech. There, the Court held that a law requiring age-verification before users could access websites with pornographic content triggered intermediate (rather than strict) scrutiny—because the law was narrowly targeted to wall minors off from content that was entirely unprotected as to them and thus that they had no constitutional right to access. The law's targeted aims meant that it only incidentally burdened speech that was protected for adults. 606 U.S. at 482-83. In contrast,

Alabama's law uses age-verification and parental-consent to wall off an entire medium of speech that minors have every right under the First Amendment to access. Under this law, no minor can access any speech available through an online app store without first submitting to age-verification and obtaining parental consent, a sweeping restriction that—in contrast to the pornography restrictions at issue in *Free Speech Coalition*—cannot be justified by reference to any brick-and-mortar analog. 606 U.S. at 466, 480-84. Especially given Alabama's content-based purpose, its effort to apply these speech restrictions across the entire frontier of protected app-based information, ideas, and expression requires the most stringent form of First Amendment scrutiny.

4. <u>The Age Verification and Parental Consent Requirements Are Not Narrowly Tailored and Cannot Survive Any Form of Heightened Scrutiny</u>

Laws triggering strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs. ("NIFLA") v. Becerra*, 585 U.S. 755, 766 (2018) (citation omitted). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

But even if intermediate scrutiny applied, it is also rigorous. *City of Austin v. Regan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). To survive intermediate

scrutiny, the law "must be narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 950 (11th Cir. 2022) (cleaned up). The statute must "advance[] important governmental interests *unrelated to the suppression of free speech*" and must "not burden substantially more speech than necessary to further those interests." *Uthmeier*, 2026 WL 3071065, at *9 (citing *TikTok v. Garland*, 604 U.S. 56, 70 (2025)) (emphasis added). "By demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrific[ing] speech for efficiency." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (cleaned up).

Regardless of Alabama's purported interest, the Act is not tailored in any meaningful way and thus burdens "substantially more speech than necessary" to further its interests. *Florida Preborn Rescue, Inc. v. City of Clearwater*, 161 F.4th 732, 747 (11th Cir. 2025) (affirming preliminary injunction under intermediate scrutiny). The Act is at once wildly overbroad and strikingly underinclusive. It also ignores existing less restrictive alternatives, both legal and technical. Independently and together, these deficiencies condemn the law even under intermediate scrutiny.

*a. The Act's Verification and Consent Regime Is Overinclusive*

As explained above, Alabama attempts to use overbreadth as a way of legislating around strict scrutiny, but in doing so, it has impermissibly "foreclose[d] an entire medium of expression." *City of Ladue*, 512 U.S. at 55. Indeed, the breathtaking scope of the Act renders it fatally overbroad: the legislature has placed age verification and parental consent as a prerequisite to *every* mobile app download and in-app purchase, but it cannot provide support for a relationship between the *content* of *all mobile apps* and harms to minors. There is no reason to impose an age verification requirement for adults and minors alike on apps that offer newspaper content, sports coverage, religious worship, basic information services such as maps and dictionaries, and all manner of entirely benign and unequivocally protected speech.

It is hard to conceive of a less narrowly tailored solution to the State's asserted interests. The sheer volume of protected speech subject to the Act's scheme is far greater than the restrictions on violent video games in *Brown*, the restrictions on access to social media websites enjoined by district courts in other states,[13] and the age-verification requirement tailored to pornographic websites in *Free Speech*

[13] *See NetChoice, LLC Reyes*, 748 F. Supp. 3d 1105, 1131 (D. Utah 2024); *NetChoice v. Murrill*, 2025 WL 3634112, at *2-3 (M.D. La. Dec. 15, 2025); *Paxton*, 747 F. Supp. 3d at 1038; *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262, 282 (S.D. Miss. 2025); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

*Coalition*. Alabama's statute is the equivalent of forcing bookstores to "card" all customers for each purchase and prohibit the sale of any books to minors without express parental permission. *See Brown*, 564 U.S. at 795 n.3. And, whereas a history and tradition of brick-and-mortar analogs motivated the Court to uphold the age-verification requirement for pornographic websites in *Free Speech Coalition*, 606 U.S. at 483-84, there is no tradition (and certainly no constitutionally approved tradition) of legally requiring age verification, parental verification, or parental consent for the brick-and-mortar equivalent of app stores—general purpose movie theaters, libraries, bookstores, and museums. Even under intermediate scrutiny, the Act's requirements "burden substantially more speech than is necessary to further" Alabama's modest interest in providing restrictions for minors around harmful content and contracts. *Free Speech Coal.*, 606 U.S. at 496; *see also Packingham*, 582 U.S. at 106.

The Eleventh Circuit's recent opinion in *CCIA v. Uthmeier* underscores the Act's overbreadth. There, the court found that Florida's restrictions on social-media access for minors were sufficiently tailored under intermediate scrutiny because the statute there "(1) calibrates its restrictions by age, (2) regulates minors' creation of social-media accounts, not necessarily their access to the platforms themselves, (3) covers only those platforms that have been determined to induce heavy use by

children, and (4) applies only to platforms that use both algorithms and one of several addictive features." 2026 WL 3071065, at *13. In other words, Florida's law did not apply to all minors or all social-media platforms—reflecting the legislature's efforts to tailor the statute to the specific people and platforms the State wished to regulate.

Alabama's law, by contrast, has none of the "numerous limitations on [the Act's] sweep" that HB3 had. *Id.* at *14. Whereas HB3 recognized "the fine-grained distinctions" among children, pre-teens, and older teens (*id.* at *13), Alabama's law treats everyone under 18 the same. Whereas HB3 operated only as a "conditional ban . . . on platforms' use of addictive features and algorithms," Alabama's law operates as an "outright prohibition of [app store and app] usage" absent age verification and parental consent. *Id.* And whereas HB3 "targets only the platforms to which many minors are already addicted" (*id.*), Alabama's law subjects every app store and every app to its sweeping age-verification and parental-consent mandate, regardless of what features it employs, what it allows users to do, and how harmful the legislature perceives it to be.

*b. The Act Regulates Far More Than Contracts and Commercial Speech*

Insofar as Alabama's supposed governmental interest is "to protect children from inappropriate material on the internet" (*see supra* § II.A.3(a)), that interest is

directly related "to the suppression of free speech." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997). That purpose cannot justify a sweeping, undifferentiated restriction across all mobile app stores and apps. If the state wishes to protect children from online material that is truly harmful or inappropriate, it must do so in a far more nuanced and targeted way.

Another unavailing justification for the Act is that it seeks to prevent children from entering into commercial contracts with certain undescribed harmful terms. If that were truly the legislature's aim, the Act is not at all tailored to that goal. The Act is untethered to any contractual terms or provisions, and it contains no provisions regulating the manner in which apps are permitted by contract to collect, process, transfer, and/or store minors' data.

Nor can the Act be defended as a mere commercial speech regulation. Commercial speech is a narrow category of speech that "does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). The Supreme Court has kept the definition narrow "lest speech deserving of greater constitutional protection be inadvertently suppressed." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 579 (1980) (Stevens, J., concurring). But the Act's scope is anything but narrow: nothing

in its coverage definition is limited to "commercial" apps or apps offered for sale. And even then, speech does not become "commercial" merely because it is "uttered for a profit." *Bd. of Trs. of State of Univ. of N.Y. v. Fox*, 492 U.S. 469, 481-82 (1989); *accord Va. Pharmacy Bd.*, 425 U.S. at 761; *303 Creative*, 600 U.S. at 594. That is why the Supreme Court in *Brown* applied strict scrutiny to (and struck down) a law restricting the "sale or rental" of video games to minors, notwithstanding attempts to frame the statute as just restricting commercial transactions. *See* 564 U.S. at 792 n.1. Thus, the fact that the law regulates some expression that is disseminated for profit does not immunize it from heightened First Amendment scrutiny.

*c. Existing Parental Controls and Laws Diminish the State's Interest and Further the Act's Tailoring Problem*

The Act's parental consent requirements amplify the speech burdens on minors and parents and force a government solution where ample private solutions are already in place. Even under intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Yet here, the State has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *Id.* at 490. The mobile app stores and apps that the Act regulates already have meaningful voluntary protections that facilitate parental control. *See supra* Background § B. As in *Brown*, the State cannot

provide evidence that its *less robust* version of controls that App Stores have already developed on a voluntary basis "meet[s] a substantial need of parents who wish to restrict their children's access to [apps] but cannot do so." *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *14 (W.D. Ark. Mar. 31, 2025) (citing *Brown*, 564 U.S. at 803). Thus, Alabama's "purported aid to parental authority is vastly overinclusive .... While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not the "narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Brown*, 564 U.S. at 804.

Even beyond those voluntary solutions, related legislative enactments confirm the existence of far more narrowly tailored paths to achieve the State's purported ends. For example, Alabama's "Porn ID law," which went into effect on October 1, 2024, requires adult websites to verify that users are 18 years of age or older before granting access to explicit content. Ala. Code § 8-19G-2. In *Free Speech Coalition*, the Supreme Court upheld that type of tailored approach targeted at content unprotected as to minors. And as for the legislature's purported interest in protecting minors from entering into harmful contracts, "Alabama, like virtually all jurisdictions, applies the longstanding common law rule that, except for a contract

for necessaries, a minor is not liable on any contract he makes and that he may disaffirm the same." *J.T. ex rel. Thode v. Monster Mt., LLC*, 754 F. Supp. 2d 1323, 1326 (M.D. Ala. 2010) (cleaned up).

In the face of these existing voluntary practices and legislative measures that address the legislature's purported concerns, Alabama's App Store Accountability Act serves no valid purpose. And it is certainly not narrowly tailored to advance the government's purported interest while minimizing the impact on protected speech. *See Brown*, 564 U.S. at 803 ("Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest.").

*d. The Act is also Woefully Underinclusive*

The Act is not just overbroad—it is also so underinclusive as to "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes[.]" *Brown*, 564 U.S. at 801. House Speaker Ledbetter endorsed the Act by noting that "there is a great deal of content available on [smartphones, tablets, and other electronic devices] that kids simply have no business ever seeing." *See supra* n.9. Yet all non-mobile-device channels for accessing the same speech are left entirely unregulated by the Act. *See* §§ 1(5)-(7), 1(13)-(14). The law requires nothing at all—no age verification; no parental verification; no parental consent—for minors to access the same or similar services when available on a website (even

a mobile website), via apps on non-mobile surfaces, or in physical stores. Minors can therefore skirt the Act's age verification and parental control requirements by, for example, merely using a web browser on their mobile device, laptop or desktop computer. *See* Strauser Decl. ¶ 18.

Such obvious underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *City of Ladue*, 512 U.S. at 52. It suggests that the State is not actually serious about preventing minors from accessing harmful content (or contracts), as it leaves them free to access the same speech (and be bound by the same contracts) via different technology. As such, the Act simultaneously burdens speech while leaving a gaping hole that undermines the State's own purported interests. Because the Act is "wildly underinclusive when judged against its asserted justification, [that]. . . is alone enough to defeat it." *Brown*, 564 U.S. at 801.

## III. THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION

### A. CCIA and Its Members Will Suffer Irreparable Harm if the Act Is Not Enjoined

CCIA's "likelihood of success on the merits" means "the remaining requirements" for preliminary-injunctive relief "necessarily follow." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). Because the

Act violates the First Amendment rights of CCIA and its members, they will suffer irreparable harm without a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). CCIA has demonstrated that the Act unconstitutionally deprives CCIA, its app store and developer members, and their adult and minor users, of their First Amendment rights to create, facilitate, and access all manner of protected speech.

In addition to the loss of First Amendment freedoms, CCIA and its members will face nonrecoverable compliance costs if the Act is not enjoined. *Florida v. Dep't of H.H.S.*, 19 F.4th 1271, 1313-14 (11th Cir. 2021) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs"); Schruers Decl. ¶¶ 44-48; Bye Decl. ¶¶ 36-45; Strauser Decl. ¶¶ 12, 17-18. There is no industry standard for age verification, and "every solution has serious privacy, accuracy, or security problems." Schruers Decl. ¶ 46; *see also* Bye Decl. ¶ 37. CCIA's app store members "will spend large, unrecoverable sums up front to develop the proper capabilities[]" to verify a user's age, and even more to develop parental verification procedures or expand existing parental consent infrastructure. Schruers Decl. ¶¶ 46-47; Bye Decl. ¶¶ 37-42. Even large app stores

like Google will incur "large upfront and ongoing investment of resources to, among other things, evaluate identity, verify documentation, make updates to reflect changing custodial relationships, and address inter-family disputes." Bye Decl. ¶ 39. Additionally, CCIA's app store members will have to invest significant resources protecting the large amounts of sensitive personal data in accordance with the Act, both in storage and in transit to millions of app developers. *See* § 6 (imposing data protection requirements); Schruers Decl. ¶¶ 45-46; Bye Decl. ¶ 44.

CCIA's developer members also face unrecoverable compliance costs in creating and implementing a system to ingest app stores' age signals to "verify" a user's age category and whether parental consent has been obtained. Schruers Decl. ¶ 47; Strauser Decl. ¶ 12. These burdens are particularly likely to deter small developers of apps that provide access to culture, speech, music, games, health, translation services, and community. Many small developers—including Alabama newspapers, news channels, libraries, and other publishers—will not possess the resources to properly accommodate the sensitive age and identification data the Act requires them to ingest. Bye Decl. ¶¶ 44-45. Those developers will either stay and imperil the integrity of the entire system, or they will no longer find it cost-effective to publish an app at all. *See* Schruers Decl. ¶ 48; Bye Decl. ¶¶ 44-45, 48. This deprives app stores of security, content and revenue, and most importantly, it

deprives all users of access to invaluable speech.

Finally, CCIA members' users—both adult and minor—are also significantly burdened by the Act. *See supra* § II.A(1)-(2).

### B. A Preliminary Injunction is in the Public Interest

The balance of equities and public interest also favor enjoining the Act because the First Amendment rights of CCIA and its members will be infringed if a preliminary injunction is not granted. Schruers Decl. ¶¶ 51-57; Bye Decl. ¶¶ 9, 46-49; Strauser Decl. ¶¶ 13-17. *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (the final two factors "merge" when, like here, the government is the opposing party). Because CCIA has shown a substantial likelihood of success on the merits of its First Amendment claims, an injunction is in the public interest. *Dep't of H.H.S.*, 19 F.4th at 1315 ("there is no public interest in the perpetuation of unlawful agency action.") (cleaned up).

## IV. THE AGE VERIFICATION, PARENTAL VERIFICATION AND PARENTAL CONSENT PROVISIONS CANNOT BE SEVERED FROM THE REST OF THE ACT

The severability of a statute is an issue of state law. *Anders v. Hometown Mortg. Servs.*, 346 F.3d 1024, 1032 (11th Cir. 2003) (applying Alabama law to severability issue). While "Alabama law favors severability," *id.*, there are limits to the court's power to save a statute. In Alabama, if "the invalid portions are . . . so

intertwined with the remaining portions that such remaining portions are rendered meaningless by the extirpation," then "the entire act must fall." *King v. Campbell*, 988 So. 2d 969, 982 (Ala. 2007) (cleaned up).

That is the case here. As discussed, the centerpiece of the Act is the threshold age verification and parental-tethering and consent scheme. Without collecting the age verification information and doing the required tethering, the provisions requiring app stores to obtain parental consent for all app downloads and in-app purchases simply cannot operate. Indeed, every single affirmative obligation and prohibition imposed on CCIA's member app stores depends on account-level age-verification and parental tethering. *See* §§ 4 (parental consent requirement for significant changes); 5 (requirement that app stores provide developers access with age-category and parental-consent data); 6 (data protection requirements for age-category and parental-consent data); 7 (identical age-verification and parental consent requirements for pre-installed apps); 8 (prohibitions predicated on parental consent and collection of age category and parental consent data).

Likewise, without app stores serving their gatekeeping function, the app developer provisions cannot function either. *See* §§ 9 (verification, consent, and use limitations predicated on obtaining age category and parental consent from the app store); 12 (safe harbor provisions requiring good faith reliance on age-category and

parental-consent data from app store). Similarly, because the age-rating provisions are tethered to the unconstitutional parental disclosure requirement (which is further tethered to the age verification requirement), those provisions requiring content-ratings and descriptions necessarily fall as well.

In short, under Alabama's functional severability analysis, a determination that the core age verification and parental consent provisions are unconstitutional means that none of the Act can survive.

## CONCLUSION

CCIA respectfully requests that this Court enjoin Defendant from enforcing Alabama's App Store Accountability Act against CCIA members until a final judgment on the merits is rendered.

Respectfully submitted,

*/s/ J. Evans Bailey*

J. Evans Bailey (ASB-9995-J61B)
Attorney for Plaintiff

**OF COUNSEL:**
Rushton, Stakely, Johnston & Garrett, P.A.
P.O. Box 270
Montgomery, Alabama 36101-0270
334-206-3100
ebailey@rushtonstakely.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

and have provided a copy by U.S. Mail, First Class, properly addressed and postage prepaid to the following:

The Honorable Steve Marshall
Attorney General
501 Washington Avenue
Montgomery, Alabama 36104

*/s/ J. Evans Bailey*